## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARCUS M.,

      Plaintiff,

      v.                                        Civ. No. 22-943 SCY

MARTIN O'MALLEY,
Commissioner of Social Security,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

Plaintiff argues that the Commissioner committed error when denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401-434. Specifically, Plaintiff asserts that the ALJ erred by finding unpersuasive the severe mental limitations which every medical opinion in the file assessed. The Court finds error in the ALJ's discussion of the opinion of Plaintiff's treating psychiatrist, Dr. Gillikin. The ALJ cited certain evidence as being inconsistent with Dr. Gillikin's opinion which is, in fact, consistent with her opinion. As a result, the Court GRANTS Plaintiff's Motion for Reversal and Remand for Further Proceedings and accompanying memorandum, Docs. 17, and remands the case for further proceedings.[1]

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member. Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 7, 8, 9. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). The Court reserves discussion of the background, procedural history, and medical records relevant to this appeal for its analysis.

## APPLICABLE LAW

A.    Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also id.* § 1382c(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[2] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the

---

[2] "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). The claimant's "[w]ork may be substantial even if it is done on a part-time basis or if [he] doe[es] less, get[s] paid less, or ha[s] less responsibility than when [he] worked before." *Id.* "Gainful work activity is work activity that [the claimant] do[es] for pay or profit." *Id.* §§ 404.1572(b), 416.972(b).

most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of the claimant's past work. Third, the ALJ determines whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

B.    Standard of Review

The court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the court neither reweighs the evidence nor substitutes

its judgment for that of the agency. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). "Substantial evidence . . . is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Therefore, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence" and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (internal quotation marks omitted). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

## ANALYSIS

Plaintiff argues that all the medical opinions in the record assigned functional limitations which were more restrictive than those in the RFC, and which would result in a finding of disability under a listing, based on documented delusions and hallucinations and a marked limitation in interacting with others. Doc. 18 at 9. The ALJ found every opinion at least partially unpersuasive to the extent they assessed more severe limitations than those in the RFC. As support for her conclusion, the ALJ cited the conservative nature of Plaintiff's treatment; evidence of some benign mental health findings; treatment noncompliance or gaps in treatment; improvement in symptoms in 2021 and 2022; and Plaintiff's own belief that he could work and how he did seek work.

Plaintiff argues error with respect to the ALJ's evaluation of each of the medical opinions in the file: the state agency nonexamining psychological consultants, Dr. Kingston's consultative psychological examination, and Dr. Gillikin's treating source assessment. The Court agrees that the ALJ erred in evaluating Dr. Gillikin's opinion, and reverses and remands for a rehearing.

A.    Legal Standard

For claims filed on or after March 27, 2017, all medical sources can provide evidence that is categorized and considered as medical opinion evidence and subject to the same standard of review. 20 C.F.R. § 416.920c(b). The factors of supportability and consistency are the most important factors in determining the persuasiveness of a medical opinion. *Id.* § 416.920c(b)(2). "Supportability" examines how closely connected an opinion is to the evidence and explanations presented in that opinion. *Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *6 (10th Cir.

July 6, 2021).[3] It means "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that medical opinion." 20 C.F.R. § 416.927(c)(3). "Consistency" compares a medical opinion to the evidence in the rest of the record. *Id.* An ALJ may, but is not required to, consider other factors such as relationship with the claimant and specialization. *Zhu*, 2021 WL 2794533 (citing 20 C.F.R. § 416.920c(c)).

   B.    Background and Dr. Gillikin's opinion

Plaintiff is alleging disability since March 1, 2018. AR 774. The ALJ found severe impairments of bipolar disorder; schizoaffective disorder; and post-traumatic stress disorder. AR 778. As the ALJ explained, Plaintiff's treatment for mental health conditions began before March 2018. In March 2016, he was diagnosed with a mixed bipolar disorder, cannabis-induced mood disorder, and PTSD. He was discharged from mental health services in August 2017 but returned to treatment in mid-October 2017 and attended a psychiatric diagnostic examination in early December 2017. There is no evidence of mental health treatment between December 2017 and April 2018. In April 2018, Plaintiff resumed doctor visits for psychiatric medication management and received consistent treatment through May 2019. AR 787.

In October 2018, Plaintiff started seeing Cynthia Gillikin, M.D., for psychiatric medication management. AR 788. The majority of the claimant's subsequent psychiatric medication management visits, for example through May 2019, and then again from October 2020 to December 2020, were with Dr. Gillikin. AR 787 n.1. On June 5, 2019, Dr. Gillikin

---

[3] The Court cites unpublished Tenth Circuit cases for their persuasive value. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

completed an assessment of Plaintiff's ability to sustain work-related mental activities. AR 698.

The form is categorized into seven subsections.

- <u>Making Occupational Adjustments</u>: Dr. Gillikin opined that with respect to most tasks listed on the form, Plaintiff could perform less than 75% of a workday (follow work rules; relate appropriately to co-workers, the public, and supervisors; handle normal workplace changes and ordinary stresses; remain on-task without extra supervision; sustain an acceptable pace without supervision; and meet attendance standards). Plaintiff can perform the remaining tasks for 80% of the workday (learn, understand, and use new information and instructions). She supported this assessment with the clinical findings that "Pt has delusional thoughts, paranoia, and mood disturbance that negatively affect work functioning to a severe/significant degree." AR 698.

- <u>Making Performance Adjustments</u>: Dr. Gillikin opined that with respect to simple job instructions, Plaintiff can understand and remember them 80% of the workday and carry them out less than 75% of the weekday. With respect to more than one-or two-step instructions, Plaintiff can understand, remember, and carry them out less than 75% of the workday. She supported this assessment with the clinical findings of "decreased memory, concentration, and disorganized thought process." AR 698.

- <u>Making Personal-Social Adjustments</u>: Dr. Gillikin opined Plaintiff can behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability less than 75% of the day. She supported this assessment with the clinical findings of "Function decreased due to psychotic symptoms." AR 699.

- <u>Other Work-Related Limitations</u>: Dr. Gillikin wrote: "Mood disorder with psychosis - by bizarre preoccupation and disorganized, preservative thinking." AR 699.

- <u>Effect of Work Stressors</u>: Dr. Gillikin opined that Plaintiff would "be more limited in a work setting than shown in treatment records." She wrote that "Pt would likely be unable to perform job duties to symptoms." AR 699.

- <u>Onset of Above Limitations</u>: Dr. Gillikin opined that Plaintiff's mental disorders producing the limitations have existed for 2 years or more, at least since July 2018. AR 699.

On December 8, 2020, Dr. Gillikin completed a Medical Assessment of Ability to Do

Work-Related Activities (Mental). AR 1652. In this form, she opined on these categories of

functioning:

- <u>Understanding and Memory</u>: Plaintiff's ability was Poor/None with respect to relating to co-workers; dealing with public; interacting with supervisors; dealing with work stress; and maintaining attention and concentration. His ability was "Fair" with respect to following rules; using judgement; functioning independently; and adjusting

to simple job instructions. She supported this assessment with clinical findings that Plaintiff "has Schizoaffective Disorder and is preoccupied with paranoid, delusional thoughts and disorganized thought process. He is unable to function in a work environment." AR 1652.

- <u>Making Social Adjustments</u>: Plaintiff's ability was Poor/None with respect to behaving in an emotionally stable manner; relating predictably in social situations; and demonstrating reliability. His ability was "Fair" with respect to maintaining personal appearance. She supported this assessment with clinical findings that "He is emotionally labile, unpredictable emotions and reactions to stressors. He is also repeatedly in and out of treatment which demonstrates his unreliability." AR 1652.

- <u>12.04 Depressive, Bipolar and Related Disorders</u>: Gr. Gillikin opined Plaintiff met the listing criteria. Symptoms supporting her assessment included depressed mood, diminished interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating; thoughts of death or suicide; pressured speech, flight of ideas, distractibility, involvement in activities that have a high probability of painful consequences that are not recognized. She supported this assessment by explaining that Plaintiff "displays a recurrent pattern of thought disorder, disorganized and impulsive behavior, and delusions of persecution, bizarre delusions, and difficulty concentrating, relating to others in a predictable way, or behaving consistently. . . . He speaks rapidly and with flight of ideas. He expresses bizarre ideas and delusions about aliens, patterns in the sky which have special meaning to him. He has intense emotional swings in session with this MD." AR 1654.

The ALJ found Dr. Gillikin's 2019 opinion unpersuasive for a number of reasons. AR 798-99. The ALJ then discussed the 2020 opinion and found it unpersuasive for almost identical reasons. AR 799. Plaintiff argues that all of the ALJ's reasons are legally insufficient. Considering the 2019 and 2020 opinions together, the Court examines each of the ALJ's reasons in turn.

C.    <u>The ALJ's bases for finding Dr. Gillikin's opinion unpersuasive</u>

1.    <u>Conservative treatment</u>

The ALJ stated that Dr. Gillikin's opinion "is not supported by [Dr. Gillikin's] own treatment notes. While her examinations certainly documented some abnormal signs, the[y] also

documented essentially very conservative treatment." AR 798.[4] Elsewhere, the ALJ explained

that he characterized this treatment as "conservative" in that it did not involve "inpatient

psychiatric treatment for uncontrolled symptoms" or "injections for uncontrolled psychosis." AR

790. The ALJ found that the conservative treatment led to improvement, and that improvement

with conservative treatment was "inconsistent with the statements about the intensity,

persistence, and limiting effects of the claimant's symptoms." *Id.* I address the ALJ's discussion

of improvement in a later section and focus here on the ALJ's reasoning that Dr. Gillikin's

treatment notes are inconsistent with her opinion because of the conservative nature of the

treatment.

Plaintiff argues that, in questioning the doctor's opinion based on the treatment the doctor

prescribed, the ALJ engaged in impermissible "lay interpretation of raw medical data." Doc. 18

at 12. In response, the Commissioner argues that courts have permitted an ALJ to consider

evidence that a claimant has not been hospitalized for psychiatric symptoms. Doc. 23 at 15-16.

The Commissioner also emphasizes that the ALJ "accurately and directly recited the medication

types and dosages as set forth by Plaintiff's treatment provider in his treatment notes, along with

his provider's own notation that she had considered increasing the dosage but ultimately declined

to do so." *Id.* at 16.

I have observed that it is challenging to differentiate the circumstances under which an

ALJ may, or may not, question a doctor's opinion on the basis of other medical evidence. On the

one hand, it is well established that an ALJ may discount a treating physician's opinion when it

---

[4] The ALJ explained: "[N]amely, low doses of Abilify and Effexor in 2018 and first half of 2019, and only the low dose of Abilify in the latter part of 2020. In fact, in the latter part of 2020, Dr. Gillikin noted that she may prescribe Effexor again if it becomes necessary, but then continued to observe that the claimant's current mood was level, so she continued to defer the prescription of that medication through December 2020." AR 798.

is inconsistent with the record evidence. *Baca v. Berryhill*, No. 15cv938 SCY, 2017 WL 3585650, at *7 (D.N.M. Mar. 31, 2017).[5] On the other hand, "an ALJ may not judge a medical professional on how he should assess medical data." *Id.* (internal quotation marks omitted).

"Indisputably, the ALJ may discount the doctor's opinion through evidence acquired totally outside the parameters of the treating physician's examination." *Id.* at *8. For example, "[i]f a claimant effortlessly walks into a hearing before the ALJ, the ALJ does not have to accept a treating physician's opinion that the claimant cannot walk and will never be able to walk." *Id.* I then applied this doctrine to subjective symptom evidence, explaining that "when a treating physician's opinion is based on subjective information a claimant provides and that the ALJ appropriately finds not credible, the ALJ can discount that opinion." *Id.* at *9. "[A]lthough the ALJ cannot substitute his judgment for that of a psychiatrist, the Tenth Circuit has not forbidden an ALJ from considering information unavailable to the psychiatrist that discredits the subjective statements on which the psychiatrist relied." *Id.* (internal quotation marks omitted).

On the other hand, I have considered it "lay speculation" when an ALJ relies on inconsistencies between a doctor's opinion and record evidence of which the doctor was aware. Such record evidence cannot be inconsistent with a doctor's opinion when the doctor "already took it into account." *Patricia M. v. Kijakazi,* No. CV 21-265 SCY, 2022 WL 3083721, at *7 (D.N.M. Aug. 3, 2022). As I explained in that case:

> [T]he ALJ rejected an examining doctor's assessment that Plaintiff is experiencing significant anxiety and depression that would impact mental work-related abilities. The primary evidence the ALJ cites to reject this opinion (normal or appropriate mood/affect/orientation/behavior/thought content/cognition/ memory) is evidence Dr. DeBernardi herself considered. In other words, Dr.

---

[5] This opinion was issued under the pre-2017 regulations. But the discussion of the meaning of "consistency" applies equally to the post-2017 regulations. Unchanged is the requirement that the ALJ consider whether the opinion is consistent with the other evidence in the record. *Compare* 20 C.F.R. § 416.927(c)(3)(4), *with* 20 C.F.R. § 416.920c(c).

DeBernardi—like the other providers whose notes the ALJ cites—considered Plaintiff's behavior and thought content to be appropriate. But Dr. DeBernardi nonetheless found that Plaintiff's depression and anxiety would likely impact her ability to do work. Therefore, these other findings in the record do not undermine Dr. DeBernardi's medical assessment because Dr. DeBernardi already took it into account. The ALJ does not indicate how, for example, appropriate behavior and thought content displayed in a medical exam undermines Dr. DeBernardi's conclusion that Plaintiff's anxiety and depression are significant and would likely impact her ability to work.

*Id.*

In past cases, I have affirmed the ALJ where she discounts a physician's opinion on mental functioning because of a lack of episodes of decompensation.[6] In *Rush v. Saul*, "Dr. Hall opined that Ms. Rush experienced repeated episodes of decompensation, each of extended duration, despite no evidence that Ms. Rush had ever been hospitalized or required inpatient treatment except for her one visit to the ER for anxiety." 389 F. Supp. 3d 957, 972 (D.N.M. 2019) (internal quotation marks omitted). I affirmed the ALJ's finding of inconsistency because Dr. Hall's opinion appeared to rely on the existence of episodes of decompensation, but the record did not show that the claimant had experienced any. *Id.*

Applying these principles to this case, Plaintiff's course of conservative treatment does not amount to an inconsistency between the record and the medical opinion. This is not a case where the claimant says he was hospitalized, the doctor believes him and issues an opinion that his limitations are severe due to the need for hospitalization, and then the record demonstrates

---

[6] "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation." *Davison v. Colvin*, 596 F. App'x 675, 678 (10th Cir. 2014) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4)). "They 'may be inferred from medical records showing significant alteration in medication or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household).'" *Id.* (alterations omitted). "[T]he listings define the term 'repeated episodes of decompensation, each of extended duration' as 'three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.'" *Id.*

there was no hospitalization. Dr. Gillikin did not assume the existence of or rely on any episodes of hospitalization or decompensation when forming her opinions. More importantly, Dr. Gillikin knew what treatment Plaintiff was undergoing because she was the one managing his medications. Nothing in Dr. Gillikin's opinions states that she conditioned such opinions on an assumption that Plaintiff required inpatient psychiatric treatment or injections. The Court agrees with Plaintiff that the ALJ second-guessed the medical opinion of the doctor based on medical data the doctor herself relied on in forming her opinion. This is not the ALJ's role, and as such, not a legitimate reason to find a doctor's opinion unpersuasive.

As noted above, the Commissioner contends it is not error for the ALJ to rely on the lack of episodes of decompensation, or to accurately summarize Plaintiff's medications. Doc. 23 at 15-16. The Commissioner cites two cases finding the ALJ properly relied on the lack of hospitalization as part of a credibility (now termed "subjective symptom") analysis. *Martinez v. Berryhill*, No. 17cv506, 2019 WL 1331902, at *13 (D.N.M. Mar. 25, 2019); *Aguilar v. Berryhill*, No. 15cv896, 2017 WL 1380643, at *4 (D.N.M. Mar. 31, 2017). Neither case is on point here because neither addresses the question of whether such evidence is inconsistent with a doctor's opinion that does not assume the existence of any episodes of hospitalization. The Commissioner is correct that the ALJ did not err by observing the lack of hospitalization or accurately summarizing medications. The ALJ's error, however, is found elsewhere. Although the ALJ committed no error in accurately describing the evidence, the ALJ did commit error in finding that this evidence is inconsistent with Dr. Gillikin's opinion when it is not. I therefore find error in the ALJ's statement that Dr. Gillikin's opinion is inconsistent with Plaintiff's course of conservative treatment.

2.    <u>Benign objective signs</u>

The ALJ's second identified area of inconsistency is that "Dr. Gillikin's treatment notes in February and March 2019 documented a number of benign objective signs." AR 798. The ALJ cited mental status examinations showing an unremarkable mood and affect and linear/logical and goal-directed thought process/associations. Plaintiff continued to exhibit unimpaired memory, attention and concentration, normal insight and judgment, and a fund of knowledge and language consistent with his education level. AR 798. The ALJ also reviewed notes that Plaintiff was well-groomed with good hygiene and remained cooperative and exhibited normal speech; and that he exhibited no frank delusions despite the unusual thinking, and was not floridly psychotic. AR 798.

Many of the cited "benign" medical findings, however, evidence no inconsistency with Dr. Gillikin's opinion. Take the example of the ALJ's focus on the statement regarding frank delusions/not floridly psychotic. These remarks were made in the context of a March 2019 visit where Dr. Gillikin saw Plaintiff and summarized the visit in part by noting:

> During session, he has a lot of unusual thinking elicited, but no frank delusions. He is linear and organized, but just expresses some bizarre ideas. Feels calm and not irritable. Appetite, eats pretty good. Today again he spends some time showing this MD various pictures on his phone of "people on my TV" and does continue to feel his connection to the "natural" is strong.

AR 1461. The mental status examination from the same visit noted: "unusual and bizarre ideas expressed but is logical/linear and overall not floridly psychotic in session." AR 1466. These are the treatment notes the ALJ cites repeatedly to emphasize "benign findings" allegedly inconsistent with Dr. Gillikin's limitations. *E.g.*, AR 783, 784, 789, 798. But Dr. Gillikin's roughly contemporaneous June 2019 opinion did not state that Plaintiff is disabled because of "frank delusions" or "floral psychosis." She stated that he experienced certain bizarre and delusional thinking. AR 1652, 1654. This is consistent with her same contemporaneous treatment

notes documenting delusions about UFOs, the matrix, dragons and deities—as the ALJ acknowledged. AR 789, 791. Dr. Gillikin assigned limitations on the basis of consistencies with her treatment notes (delusional thoughts and bizarre thinking). The lack of a finding (frank delusions and florid psychosis) in both her opinion and her treatment notes does not constitute an inconsistency.

Similarly, the ALJ remarked that "the case management notes from 2021 do not show that, objectively, the claimant had significant difficulties communicating with his case manager." AR 799. But nothing in Dr Gillikin's opinion depends on difficulties communicating with Plaintiff's case manager; rather, she opines that due to his delusional thoughts, paranoia, and mood disturbance, Plaintiff has an ability to relate appropriately in a competitive employment context (with respect to co-workers, the public, and supervisors) and to remain on-task without extra supervision for less than 75% of the workday. AR 698. These statements are not dependent on or inconsistent with an ability to communicate with a case manager.

Moreover, some of the evidence the ALJ cites is in fact facially consistent with Dr. Gillikin's opinion. Take the "well-groomed with good hygiene" reference. Dr. Gillikin's opinion stated that Plaintiff's ability to maintain his personal appearance at work was "fair" rather than "poor/none." AR 1652. Examination notes reflecting that Plaintiff maintains good hygiene and grooming at times is thus consistent with her opinion.

To be sure, some inconsistencies do exist in Dr. Gillikin's opinion and her treatment notes. The ALJ cites mental status examinations Dr. Gillikin conducted that reflect linear/logical and goal-directed thought process/associations; and unimpaired memory, attention and concentration. AR 798. But Dr. Gillikin's opinion relies on findings of impaired thought processes, associations, memory, attention, and concentration to support her opinions. AR 698,

1654. The ALJ also points out that Dr. Gillikin's 2020 opinion refers to Plaintiff's "rapid speech" and "flight of ideas" when Dr. Gillikin's contemporaneous treatment notes reflect "normal" speech patterns[7] and "less prominent" delusions. AR 799.

Although there may be some inconsistencies, Plaintiff argues that the ALJ frequently relied on records which contain a mix of benign and abnormal evaluation results from the same visit. *E.g.*, AR 1444-45 (mental status examination reflecting "linear, goal-directed" thought processes and associations, but also reflecting "easily distracted" with respect to memory/ attention/concentration and "paranoid ideations" thought content along with an "upset, irritated" affect); AR 1547, 1551 (December 2020 note documenting speech "within normal limits" and stating "Since resuming Abilify his thought content is less prominently psychotic, more able to speak linearly and goal directed. Still with preoccupations and magical thinking but these are chronic"). It would therefore be inaccurate to state that these treatment notes documented no limitations in Plaintiff's functioning at the time of these visits and thus inaccurate to say they are wholly inconsistent with Dr. Gillikin's opinion.

I do not engage in a full analysis of whether the handful of normal results from these mental status examinations the ALJ cited are overwhelmed by the abnormal results documented in the treatment notes, and whether the ALJ's decision therefore lacks substantial evidence. And I do not determine whether any of the other errors in the ALJ's analysis constitute reversible error on their own, because, regardless of the outcome of that analysis, I would find the ALJ's evaluation of Dr. Gillikin's opinion to be unsupported. That is because the ALJ drew two

---

[7] Although the ALJ accurately summarizes this one treatment note, saying there is no support anywhere in the record for Dr. Gillikin's "flight of ideas" assessment is inaccurate. "Flight of ideas" is documented in medical treatment notes by other providers. AR 387 (8/29/2017 discharge summary); AR 404 (10/19/2017 clinical assessment); AR 1148 (10/4/2019 clinical report).

conclusions from this "benign" evidence: (1) where there were "more abnormal" results, they are

explained because they occurred "in the context of treatment noncompliance" and (2) "even at [a

more abnormal] time, the claimant exhibited a number of benign signs that are not indicative of

significant decompensation." AR 798. With respect to the latter conclusion, as discussed above,

lack of episodes of decompensation do not demonstrate an inconsistency in Dr. Gillikin's

opinions where Dr. Gillikin did not base her opinion on the existence of significant episodes of

decompensation. With respect to the former conclusion, I turn now to the discussion of treatment

noncompliance that appears throughout the ALJ's opinion.

### 3.    Treatment noncompliance or gaps in treatment

Incorporated into the evaluation of the persuasiveness of Dr. Gillikin's opinion is the

ALJ's narrative summary of Plaintiff's noncompliance with treatment and gaps in treatment. The

ALJ summarized the evidence as follows:

> [T]he record documented noncompliance with medication in 2018 and 2019.
> Non-compliance is also documented by virtue of the claimant's use of cannabis
> despite advice that it would have [an] adverse affect on his mental
> health/medication (3F; 5F; 17F). Moreover, the record documents a gap in
> treatment between May 2019 and October 2019. While the claimant did return for
> treatment in late 2019 (15F), he was then lost to follow up between November
> 2019 and September 2020. When the claimant again resumed treatment and saw
> psychiatrists for medication management from September 2020 to December
> 2020, he was again treated only very conservatively, only with the "small dose"
> of Abilify. In fact, his psychiatrist noted that she may prescribe Effexor again if it
> becomes necessary, but then continued to observe that the claimant's current
> mood was level, so she continued to defer the prescription of that medication
> through December 2020. (15F; 17F). Treatment notes in late 2020 also show that
> the claimant's symptoms improved with the medication (17F). There is also no
> evidence that the claimant followed up for psychiatric medication management
> after December 2020.

AR 797.

The Commissioner defends this discussion as an exercise of the ALJ's legitimate role in

weighing the evidence:

> Plaintiff also contends that the ALJ provided a "selective emphasis upon normal findings at the expense of abnormal ones." Pl. Br. 13. Not true. The ALJ acknowledged that Plaintiff exhibited paranoia, bizarre thoughts, suspiciousness, irritability, and delusions at times during mental status examinations. AR 783-84, 787-92. However, the ALJ weighed this against evidence that Plaintiff did not exhibit such abnormal findings on an ongoing basis, but rather during periods of medication non-compliance.

Doc. 14.

It is true that the ALJ did not ignore or minimize the abnormal record evidence. In an exhaustive and thorough discussion, the ALJ reviewed it all—both benign and abnormal. AR 787-795. The problem, as Plaintiff points out, is that "treatment noncompliance" is not necessarily a legitimate reason to discount functional limitations, without more. Doc. 18 at 17-18. More specifically, before relying on treatment noncompliance, the ALJ must consider whether the treatment "can be expected" to return the claimant to the ability to work and whether there is "a good reason" for the claimant's failure to adhere to it. 20 C.F.R. § 416.930; Doc. 18 at 18.

The Commissioner does not argue the ALJ considered these factors. Instead, the Commissioner argues an analysis of the factors is mandatory only if "disability [is] denied because a claimant failed to follow prescribed treatment." Doc. 23 at 19. And, the Commissioner argues, "the ALJ did not base her decision on Plaintiff's failure to follow prescribed treatment. She considered this as one piece of evidence in evaluating the consistency of the medical opinions with the overall record." Doc. 23 at 19 (collecting cases). The law in the Tenth Circuit is somewhat inconsistent on this point. *See Allred v. Comm'r, SSA*, No. 22-4044, 2023 WL 3035196, at *3-4 (10th Cir. Apr. 21, 2023) (examining this issue). Nonetheless, even accepting the Commissioner's view of the law, the argument does not prevail. That is because, in the course of this opinion, I conclude the ALJ did not give any other legitimate reasons for discounting Dr. Gillikin's limitations. As a result, treatment non-compliance stands alone as the

only basis for rejecting the limitations. Thus, even under the Commissioner's interpretation of the governing law, the ALJ must evaluate the reasons for treatment non-compliance before denying benefits on this ground.

   4.   Improvement

Next, the ALJ found that "Dr. Gillikin's opinion is also inconsistent with the medical evidence" that "documents improvement with very conservative treatment." AR 799.

> For example, in January 2022, the claimant denied psychotic symptoms, depression, sadness and anxiety. His treatment provider noted moderate progress evidenced by this denial of symptoms. (16F/82-85 [AR 1267-70]). The claimant exhibited normal signs during a case management meeting in May 2022 (16F/75 [AR 1260]). He was doing okay or fine in September and October 2022, and was discharged from services in December 2022 as he said that he no longer needed services at that time. (16F).

AR 799.

Plaintiff concedes that an improvement in functioning in 2021 and 2022, if true, "must be taken seriously" as a reason to discount Dr. Gillikin's opinion. Doc. 18 at 19. But Plaintiff argues that this is not a correct characterization of the evidence. Rather, the evidence "only supports the highly variable pattern of normal and abnormal, waxing and waning, symptoms and limitations" which are consistent with the medical opinion assessment of disabling mental impairments. *Id.*

With respect to the January 2022 visit, the ALJ accurately notes that Plaintiff denied "depression, sadness, and anxiety." AR 1267. Further, the ALJ accurately states that the provider noted "moderate progress evidenced by this denial of" anxiety and depression. AR 1269. Strikingly, however, it is *in*accurate that that the provider noted any progress in Plaintiff's psychotic symptoms. Quite the opposite. The provider noted: "When asked about paranoia cl states 'besides the devil.' Cl states he has 'pareidolia.' Cl spells this for th and provided an example that he experiences: 'see images in the clouds.'" AR 1267 [sic, generally]. And while it is true that *Plaintiff* denied psychotic symptoms, the provider's assessment disagreed, noting that

he "self diagnosed as someone that has 'pareidolia,' [as evidenced by] he is someone who can see images in clouds and cl persists with this." AR 1286. In other words, Plaintiff's denial of psychosis being demonstrably at odds with the evidence, there is nothing in this provider's assessment that is inconsistent with Dr. Gillikin's opinion based on delusions/visual hallucinations.

The ALJ cites a note from May 2022 that Plaintiff presented with "euthymic mood, appropriate affect, and was oriented x4." AR 1260. But this neither documents improvements over certain of the previous mental status examinations the ALJ referenced (as discussed above) during 2018 and 2019 reflecting appropriate mood and affect, nor does it discuss improvement in psychotic symptoms. Rather, the rest of the note says: "Client status is unchanged. Ongoing support still needed . . . . Client will continue medication management . . . ." AR 1261. The note continues to reference the need for "coping skills to manage psychosis and mood instability." AR 1259.

Finally, the ALJ relies on a discharge from services. The reason for this discharge in December 2022, however, was not an improvement in symptoms of psychosis. The reason was policy changes by the provider that caused Plaintiff discomfort:

> CM confirmed and explained new policy changes [regarding face-to-face appointments] with client. Client expressed hesitancy with capacity to adjust to changes still. CM attempted to find solutions to client's barriers with remaining compliant to current program policies. Client eventually expressed not needing services at this time, but was receptive to seeking services again when he is ready. Client could not give a definite time on when he may outreach for services again besides stating "sometime in January." CM stated this writer will discharge him from services and is willing to take him as a client again when he is ready.

AR 1238-39, 1240.

On the other side of the scale, Plaintiff highlights a variety of evidence about his mood/anxiety from this time period which do not document improvement, and which the ALJ did not discuss:

> In November 2021 and February 2022 records demonstrate ongoing auditory and visual hallucinations, paranoia, tangential thought processing, irritation, low mood, low motivation and "anxiety in several areas." Tr. 1212; 1200. In December 2021 his most recent stressors involved that his mother needed him to move out of their house, recent deaths in the family, and his daughter not being allowed to speak with him at Christmas time. Tr. 1271-72. . . .  In February 2022 is ongoing problems of psychosis, mood disturbance, and anxiety were noted, and the focus of this visit was to assist Plaintiff in obtaining mood stability, despite ongoing visual hallucinations. Tr. 1263. . . . August 2022 records demonstrate that despite some normal findings, he still "endorses anxiety in several areas," Tr. 1187, and that he would only transition to a lower level of care when he "is able to report 0 symptoms of depression and anxiety, sleeps 8 hours daily, and demonstrates 100% med compliance x 12 months." Tr. 1188.

Doc. 18 at 19-20; *compare* AR 795 (addressing this chronological part of the record without discussing most of this evidence; that is, mentioning only the one instance of seeing images in the clouds in January 2022). I agree with Plaintiff's assessment of the evidence. It does not document a particularly meaningful improvement in the symptoms that form the basis of Dr. Gillikin's opinion of disabling limitations. The evidence, therefore, does not support a finding of inconsistency that undermines the persuasiveness of Dr. Gillikin's opinion.

The Commissioner defends the ALJ's finding of "improvement" by articulating it as part of the analysis of Plaintiff's failure to prescribed treatment (gaps in treatment and cessation of services). Doc. 23 at 18. As discussed above, however, to the extent that treatment noncompliance remains as the sole basis for the ALJ's reasoning, the ALJ must evaluate the factors in 20 C.F.R. § 416.930.

### 5.  Seeking Work

Lastly, in the course of evaluating Dr. Gillikin's opinion, the ALJ remarks: "The claimant also reported looking for work and working that year, and even persevering despite what appears

to have been a stressful work situation." AR 799. In support, earlier in the narrative the ALJ cites

to portions of the record noting that in February 2021, Plaintiff indicated that he could work part

time, and in September 2021, he said that he had three jobs lined up but struggled with

transportation. AR 794 (citing AR 1104, 1285-87). In November 2021, Plaintiff was also

working and a paraprofessional "noted that he was doing fairly well on his new job." *Id.* (citing

AR 1279-80).

      Certainly, evidence that Plaintiff can work would be inconsistent with Dr. Gillikin's

opinion that he cannot work. But examining the evidence does not reveal any inconsistencies

with Dr. Gillikin's opinion that Plaintiff cannot work an eight-hour workday for a sustained

period of time. That is, as Plaintiff points out, Doc. 18 at 16, the evidence does not show Plaintiff

sustained employment at a fulltime level. The ALJ cited medical records in which Plaintiff

discussed his job at "Value Village" in November 2021, and said that he was trying to switch to

a job at Walmart. AR 1279. They also reflect that Plaintiff stated the work he was looking for

was a parttime greeter position. AR 1224 (October 2021); AR 1196 (January 2022). During the

hearing, the ALJ noted that he had worked for "a short time period" in 2021 and asked if he had

worked in 2022. Plaintiff answered that he worked at "[a] Speedway and another job, like I think

I had--I only lasted like two days, like a thrift store type job." AR 820. His employment records

indicate that he earned $230.00 at "Integrity Worldwide, Inc." and $310.00 at "Georgia Thrift

Stores, Inc." in 2021, and nothing else. AR 1050. In sum, Plaintiff's work history demonstrates

only that he was engaged in limited, short-term employment, not that he could perform the kind

of sustained, fulltime work that would contradict Dr. Gillikin's opinion.

      Second, the ALJ commented that "the claimant apparently believed himself capable of

working the 3 jobs he had lined up, and was more concerned about transportation than his mental

ability to perform the jobs." AR 794. This likewise does not identify any inconsistencies with Dr. Gillikin's opinion. She did not rely on Plaintiff's self-reports about whether he was capable of working. Instead, she found that he experienced delusional thinking. Indeed, the record contains a lengthy, documented history of unusual and illogical thoughts. *See* AR 791-92 (Plaintiff reported speaking of a "UFO sucking life from the moon"; that he did not want to be "tracked by the system"; that he had preoccupations with "mythology, deities and UFOs"; that he could "see the supernatural world of dragons and deities"; that he could see "alien artifacts"; and that he "exhibited delusional thinking, discussing his ideals about alien artifacts, dragons [and UFOs] and the 'evidence' he has collected"). Plaintiff's opinion on whether he can sustain work does not constitute a basis to undermine a medical professional's opinion that he experiences delusional thinking that would interfere with his ability to perform competitive employment.

    D.    <u>Remaining medical opinions</u>

Plaintiff mounts similar challenges to the ALJ's evaluation of the remaining medical opinions in the file: the examining consultant Dr. Kingston, and the two state agency nonexamining consultants. Doc. 18 at 9. Consistent with Dr. Gillikin's opinion, the three other doctors assigned marked limitations in Plaintiff's ability to interact with others. AR 796, 799-800. The VE testified that if a hypothetical worker had marked limitations in interacting with the public, coworkers, and supervisors, that person would be unable to perform the mental demands of competitive unskilled work. AR 85.

Also consistent with Dr. Gillikin, the other three opinions assessed a compromised ability to concentrate, persist and maintain pace. The state agency consultants found Plaintiff could concentrate for up to 2-hour periods, but he would "need a supervisor who can calmly manage their limits with concentration and attention, particularly in stressful situations." AR 102. The VE testified that if the individual needed a supervisor to check in on them and provide reminders

every two hours, that person would not be able to maintain competitive employment. AR 836.

Dr. Kingston assessed moderate limitations in this area, noting that during the testing, Plaintiff's

attention was markedly impaired due to the tangents he would go on regarding his delusional

beliefs. AR 442, 445. The VE testified that if a worker demonstrated limits in concentration,

persistence, and pace, "even with occasional, moderate, or 33% of the day," that individual

would be unable to perform competitive full-time work. AR 84.

 I do not undertake a comprehensive review of the reasons the ALJ found these three

opinions unpersuasive, because reversal is required with respect to Dr. Gillikin's opinion alone. I

merely note that all four opinions are consistent with one another in the respects Plaintiff

highlights, and that no medical opinion in the file fully supports the mental limitations in the

RFC. In addition, the ALJ's discussion of the supposedly contradictory evidence in the record is

largely the same for all four medical opinions. AR 796-801.

 I likewise do not reach Plaintiff's argument that the ALJ should have considered a closed

period of disability, Doc. 18 at 21, because Plaintiff is free to make this argument to the ALJ on

remand.

**CONCLUSION**

 The Court GRANTS Plaintiff's Motion for Reversal and Remand for Further Proceedings.

Doc. 17. The case is remanded for further proceedings in accordance with this opinion.

UNITED STATES MAGISTRATE JUDGE
STEVEN C. YARBROUGH

23